UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

Page 1 of 11

In re:

PATRICK L. CAMPBELL,

               Debtor.

Case No. DK 09-09614
Hon. Scott W. Dales
Chapter 7

_____/

 KEITH J. FRAMBRO,

               Plaintiff,

v.

PATRICK L. CAMPBELL,

               Defendant.

Adversary Pro. No. 09-80542

_____/

<u>OPINION AND ORDER AFTER TRIAL</u>

PRESENT:    HONORABLE SCOTT W. DALES
                   United States Bankruptcy Judge

I. INTRODUCTION

Patrick L. Campbell ("Defendant" or "Mr. Campbell") borrowed $20,000.00 from his friend, Keith J. Frambro ("Plaintiff" or "Mr. Frambro"), to assist in purchasing a restaurant in Centerville, Michigan. Although Mr. Campbell partially repaid Mr. Frambro, the proposed restaurant purchase fell through. Mr. Campbell also experienced various medical and financial reversals, and ceased making payments on the note. On August 13, 2009, he filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. Mr. Frambro timely filed a complaint, which he later amended, seeking to except the debt from discharge under 11 U.S.C. § 523(a)(2), alleging that Mr. Campbell fraudulently induced him to make the loan through various

misrepresentations. After considering the testimony and other evidence introduced at a bench trial in Kalamazoo on August 25, 2010, the court has determined to enter judgment in favor of the Defendant, declaring that the debt be discharged.

The following constitutes the court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52 and Federal Rule of Bankruptcy Rule 7052.

## II. JURISDICTION

The court has jurisdiction over the Defendant's bankruptcy case pursuant to 28 U.S.C. § 1334(a).  This adversary proceeding is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(I), because it involves the determination of the dischargeability of a particular debt. The United States District Court for the Western District of Michigan has referred the case and all related proceedings to the bankruptcy court, pursuant to 28 U.S.C. § 157(a) and L.Civ. R. 83.2(a). Therefore, the court has authority to enter final judgment in this matter.

## III. ANALYSIS

1. <u>Findings of Fact</u>

At trial, Mr. Frambro testified, without contradiction, that he and Mr. Campbell met at a conference in California, and learned that they shared mutual interests, including a common connection to the State of Michigan.  They became friends, and visited each other from time to time when Mr. Frambro returned to visit his family and friends in Michigan. At trial, both men confirmed their former friendship and mutual admiration.

Mr. Frambro knew that Mr. Campbell was involved in a number of ventures, including a photography business, a credit card processing business, and since 1994, an ownership interest in

Angelo's Pizzeria in Centerville.  The parties agreed that Mr. Frambro presented himself as a successful professional with disposable income that permitted him to travel frequently for business and pleasure, picking up dinner checks and otherwise affecting prosperity.

In January, 2008, when Mr. Frambro was visiting his family in Michigan over the holidays, Mr. Campbell asked him if he would be willing to advance $10,000.00-$20,000.00 to help him purchase a restaurant called Lindy's, located directly across the street from Angelo's. Mr. Frambro was willing to loan the money with the condition that it would be a business loan as opposed to a personal loan. In other words, he expected repayment.  With this understanding, the parties negotiated the terms of the loan, including the interest rate, an amortization schedule, and other customary payment provisions.

After agreeing on the terms, Mr. Frambro asked his Colorado counsel to prepare a promissory note (the "Note," Exh. 1), which he forwarded to Mr. Campbell for signature. Because Mr. Frambro was not in Michigan when Mr. Campbell signed the Note, Mr. Frambro asked Mr. Campbell to acknowledge the Note before a notary public, which he did on February 12, 2008.  Although the parties understood the loan proceeds would be used to help Mr. Campbell buy Lindy's restaurant, Mr. Frambro did not condition the funding of his loan on the closing of the restaurant purchase transaction. Instead after Mr. Campbell signed and sent back the Note, Mr. Frambro sent him $20,000.00.

In making the decision to extend the loan to Mr. Campbell, Mr. Frambro understood that a mutual friend, Darrell Russell, would be involved in managing Lindy's.  Mr. Russell, like Mr. Frambro, worked with computers and information technology, but unlike Mr. Frambro, Mr. Russell also had food service management experience.  Indeed, the testimony established that Mr. Russell had at one time managed the concessions at the Baltimore Orioles baseball stadium.

Page 4 of 11

Mr. Frambro testified that Mr. Campbell never represented that he had experience managing restaurants. He was aware, however, that Mr. Campbell had owned Angelo's Pizzeria for some unspecified period of time. He also said Mr. Campbell told him Lindy's was profitable, even though it only served breakfast and lunch.  Mr. Campbell believed, and evidently persuaded Mr. Frambro, that Lindy's would become more profitable if it started serving dinner, and was under the management of Messrs. Campbell and Russell. Although neither party offered a business plan into evidence, the testimony established that Mr. Campbell presented one to Mr. Frambro and it contained business projections for Lindy's.  According to Mr. Campbell, he made the projections based on information obtained from Lindy's current owner; information gathered from the menus of other restaurants in the area; and projected increased revenue realized from serving three meals a day instead of two.  Beyond the business plan, and Mr. Campbell's statements about Mr. Russell's role and their plans for running the business, Mr. Frambro made no further inquiries of Mr. Campbell.

At trial, Mr. Campbell explained that Lindy's was a mom-and-pop, family-fare restaurant, run by an octogenarian couple looking to sell the business. He and Mr. Russell had been talking to the owner, Mr. Gates, for several months about purchasing it.  In fact, they had tentatively arranged a Small Business Administration ("SBA") loan for about ninety percent of the $390,000.00 purchase price, and he and Mr. Russell, through a partnership or limited liability company to be formed, would contribute the ten percent equity portion of the purchase price. Mr. Campbell testified that he used some of the $20,000.00 to pay for appraisals and to purchase new furnishings for Lindy's waiting room.

About three months after Mr. Frambro advanced the loan funds, the prospects of purchasing Lindy's took a turn for the worse.  First, either the SBA or the SBA-lender insisted

on getting an appraisal of Lindy's restaurant equipment, not simply the real estate where Lindy's is located.  When Messrs. Campbell and Russell approached their seller, Mr. Gates, about the additional requirement, Mr. Gates got nervous, and began asking Mr. Russell to disclose his financial condition.  This request and subsequent negotiations with Mr. Gates evidently irritated Mr. Russell so much that he eventually withdrew from the transaction.  The original SBA lender also withdrew its support for the transaction, prompting Mr. Campbell to approach another institutional lender, Portage Commerce Bank.  Although Portage Commerce Bank initially showed interest, after visiting the premises around Memorial Day weekend in 2008, it appeared to lose interest and became evasive when Mr. Campbell made telephone inquiries about the prospective loan.

Meanwhile, Mr. Campbell's roommate, who shared living expenses, moved out.  In addition, a tenant who had been renting Mr. Campbell's remodeled garage also left.  Apparently the monthly payments from the roommate and tenant covered Mr. Campbell's residential mortgage expense. This loss of income and shared living expenses came at about the same time Mr. Campbell's adjustable rate mortgage adjusted dramatically upward.  Similarly, some of Mr. Campbell's credit card lenders, who initially extended 0% teaser rates, raised their interest rates past 20% on balances due, resulting in additional payment shock. Around the same time, Mr. Campbell suffered a medical emergency affecting his gall bladder, resulting in his hospitalization.  As a consequence, Mr. Campbell incurred unanticipated and substantial medical expenses approaching $32,000.00, according to his testimony.

Mr. Campbell acknowledged that, at the time he signed the Note, he did have consumer credit card debt, but he credibly explained that he was not struggling financially. At the time, he had two tenants who were covering his home mortgage expenses, and he was benefitting from

"teaser" credit card rates that kept his monthly credit card payments under $500.00 per month, a figure he regarded as manageable.  He also testified, however, that his financial prospects took a sudden and dramatic turn for the worse when he lost his tenants, incurred medical expenses, and his mortgage and credit card interest rates spiked upward, resulting in substantially higher debt service expense.

The Plaintiff offered no evidence of any written statements from Mr. Campbell concerning his assets or liabilities, or otherwise regarding his financial condition.

2. Conclusions of Law

In his Amended Complaint, the Plaintiff asserts a right to relief under 11 U.S.C. § 523(a)(2)(A).  During his closing argument however, Plaintiff's counsel advised the court that he also intended to rely on 11 U.S.C. § 523(a)(2)(B).  Though perhaps not appreciating the significance of the addition, the *pro se* Defendant did not object to the post-trial amendment. Consequently, the court will address each aspect of 11 U.S.C. § 523(a)(2).  *See* Fed. R. Civ. P. 15(b)(2).

Section 523(a)(2) provides, in relevant part, as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt-

...

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing-

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

> > (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> > (iv) that the debtor caused to be made or published with intent to deceive ...

11 U.S.C. § 523(a)(2).  From the text of the statute, and prior decisions in our district, it plainly appears that subsections (A) and (B) are "mutually exclusive" and that any statements regarding a debtor's "financial condition, whether written or oral, are expressly excluded from subsection (A)." *Armbrustmacher v. Redburn (In re Redburn)*, 202 B.R. 917, 924 (Bankr. W.D. Mich. 1996).

A. *11 U.S.C. § 523(a)(2)(A).*

To establish a right to relief under § 523(a)(2)(A), a plaintiff must prove by a preponderance of the evidence that:

> (a) the debtor obtained money through a material misrepresentation;

> (b) at the time the debtor made the representation, he knew it was false

or he made it with gross recklessness as to its truth;

> (c) the debtor intended to deceive;

> (d) the creditor justifiably relied on the false representation; and

> (e) its reliance was the proximate cause of loss.

*See Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172 (6th Cir. 1996). The thrust of Mr. Frambro's case is that Mr. Campbell never intended to honor his obligations under the Note and falsely represented he had a present intent to pay.  In addition, Mr. Frambro contends that Mr. Campbell presented inflated projections of future income to be derived from his operation of Lindy's.

Contrary to Mr. Frambro's contention, however, the evidence established that Mr. Campbell intended to repay the debt, but was unable to do so.  In reaching this conclusion, the court relies not only on the demeanor of Mr. Campbell, but on the undisputed fact that he made eleven payments -- though some of them partial.

With respect to the business plan projections, the court notes the crucial distinction between misrepresentation of present facts, and predictions about future outcomes.  *Cf. Keeling v. Roeder (In re Roeder)*, 61 B.R. 179, 181 (Bankr. W.D. Ky. 1986) ("false representations and false pretenses encompass statements that falsely purport to depict current or past facts. [A debtor's] promise ... related to [a] future action [which does] not purport to depict current or past fact ... therefore cannot be defined as a false representation or a false pretense").  Significantly, the Plaintiff offered no evidence to contradict Mr. Campbell's testimony that his projections were based, in part, on past sales by Lindy's current management.   He estimated the average restaurant tab, assumed that Lindy's would increase revenues by offering three meals each day instead of two, and ran the numbers.  In so doing, he reviewed menus from other local restaurants.  Indeed, the court has no way of knowing based upon the record what the Plaintiff supplied, or whether the predictions would have been accurate or not. The sale of Lindy's never occurred, so Mr. Campbell did not get to prove his projections through actual operation of the restaurant.   Suffice it to say the predictions were neither scientific nor fraudulent. They were, after all, forecasts, and under the circumstances of this case, such forecasts do not support a finding of fraud.

With respect to Mr. Frambro's suggestion that he was duped into lending the money by misrepresentations about Mr. Russell's restaurant experience and his role in running the soon-to-be acquired Lindy's, the evidence establishes that Mr. Russell did have restaurant experience --

he managed the concessions at a major baseball stadium -- and at the time Mr. Frambro funded the loan, Mr. Russell did intend to be involved in the restaurant. The testimony established that Mr. Russell withdrew his participation *after* Mr. Frambro advanced the funds, and after disagreements arose with Mr. Gates. As it turns out, according to Mr. Campbell's credible testimony, Mr. Russell and the seller, Mr. Gates, had a falling-out, and the former lost interest in the transaction. Moreover, the proposed sale never closed.

Mr. Campbell was enthusiastic about purchasing Lindy's restaurant, and shared his enthusiasm and optimism with Mr. Frambro. He did not, however, misrepresent his intention to repay, or intend to deceive. As a result, Mr. Frambro cannot prevail under Section 523(a)(2)(A).

B. *11 U.S.C. § 523(a)(2)(B).*

The crux of the Plaintiff's case under § 523(a)(2)(B) is that Mr. Campbell misrepresented his outstanding debts and liabilities in order to deceive the Plaintiff about how much money the Defendant owed to other creditors, such as credit card companies, his home mortgage lender, and to his grandmother (on account of his purchase of Angelo's Pizzeria). In addition, as noted above, the Plaintiff may be suggesting that the projections contained in the business plan -- described in testimony but not itself offered into evidence -- constitute materially false statements of Mr. Campbell's financial condition, or the condition of an "insider." *See* 11 U.S.C. § 523(a)(2)(B); *id.* § 101(31) (defining "insider").

As to the supposed misstatements concerning Mr. Campbell's other debts, the court notes that the Plaintiff's theory is based more upon sins of omission than commission. Given the arms length nature of the transaction, however, the court perceives no duty on Mr. Campbell's part to volunteer any such information about his financial condition. Mr. Frambro made it very clear

that the loan transaction was strictly business, and though the parties were friends, there was no evidence of any fiduciary relationship or other special circumstances. Mr. Frambro was content not to inquire too deeply.  Regardless, and more to the point, there was no evidence that any such statements regarding Mr. Campbell's financial condition were in writing -- a fatal defect under § 523(a)(2)(B).  Indeed, the only document entered into evidence was the Note itself, which Mr. Frambro's counsel prepared.

As for the supposed financial projections contained in the business plan, the court notes that the projections did not pertain to Mr. Campbell's financial condition, or even to the condition of an insider -- indeed, he never purchased Lindy's restaurant.  They were simply projections about future contingencies, not statements of general financial condition, or even statements about particular assets or liabilities.  *See Willens v. Bones (In re Bones)*, 395 B.R. 407, 430-31 (Bankr. E.D. Mich. 2008) (discussing cases construing the term "financial condition").

On the trial record before the court, the Plaintiff did not meet his burden of proof under § 523(a)(2)(B).

## IV. CONCLUSION AND ORDER

What emerges from the testimony at trial is a picture of a relatively unsophisticated, youthful, impulsive and ambitious Mr. Campbell who had, with innocent intentions, borrowed money from a friend to start a new business just as the economy was taking a turn for the worse. He was unable to close on the proposed purchase of Lindy's because of difficulty getting final approval from the SBA lenders, and personality clashes between his partner, Mr. Russell, and Lindy's seller, Mr. Gates.   Although Mr. Campbell made eleven payments (some full, some

partial), the combination of financial and medical reversals conspired to prevent him from consummating the Lindy's acquisition and meeting his obligations to Mr. Frambro.

Based upon these facts and by judging Mr. Campbell's demeanor, the court finds that Mr. Campbell intended to honor his obligations to Mr. Frambro under the Note, but was unable to do so under the circumstances. He did not misrepresent his intention to perform. Instead, the preponderance of the evidence at trial persuades the court that the dispute between the parties arises from, and must be characterized strictly as a breach of contract outside the scope of 11 U.S.C. § 523(a)(2).

NOW, THEREFORE, IT IS HEREBY ORDERED that the Clerk shall enter judgment declaring the debt represented by the Note discharged in accordance with 11 U.S.C. § 727, and dismissing the complaint, with prejudice and without costs.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Order, and the judgment to be prepared, pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon John M. Danian, Esq. and Mr. Patrick J. Campbell.

**IT IS SO ORDERED.**

Scott W. Dales
United States Bankruptcy Judge

**Dated: August 31, 2010**